Robert F. Kramer (SBN 181706)
rkramer@feinday.com
Sal Lim (SBN 211836)
slim@feinday.com
Jeremiah A. Armstrong (SBN 253705)
jarmstrong@feinday.com
FEINBERG DAY KRAMER ALBERTI
LIM TONKOVICH & BELLOLI LLP
577 Airport Boulevard, Suite 250
Burlingame, California 94010
Telephone: (650) 825-4300
Facsimile:  (650) 460-8443

Andrew G. DiNovo (*pro hac vice* application forthcoming)
adinovo@dinovoprice.com
Nicole E. Glauser (*pro hac vice* application forthcoming)
nglauser@dinovoprice.com
DINOVO PRICE LLP
7000 N. MoPac Expressway, Suite 350
Austin, Texas 78731
Telephone: (512) 539-2626
Facsimile:  (512) 539-2627

Attorneys for Plaintiff
KlausTech LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KLAUSTECH LLC,<br><br>　　　　　　*Plaintiff,*<br><br>　　v.<br><br>GOOGLE LLC,<br><br>　　　　　　*Defendant.* | Case No. 3:20-cv-04459<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

KlausTech LLC ("KlausTech" or "Plaintiff") files its Complaint for Patent Infringement and Demand for Jury Trial against Google LLC ("Google" or "Defendant") and alleges as follows:

## I.    THE PARTIES

1.      KlausTech is a limited liability company organized and existing under the laws of the State of Nevada with the address 1360 Temple Hills Dr., Laguna Beach, California 92651.

2.      Google is a Delaware limited liability corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## II.   JURISDICTION AND VENUE

3.      This is an action for infringement of a United States patent arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.  This Court has original and exclusive jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Google has one or more regular and established places of business in this District, has transacted business in this District, and has committed and/or induced acts of patent infringement in this District.

5.      Google is one of the world's largest technology companies and conducts product development, engineering, sales, and online retail, search, and advertising operations in this District.

6.      Google directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell, sells, and/or imports the infringing product(s) and/or service(s) at issue in this litigation in and/or into the United States, including in and/or into this District, and otherwise purposefully directs infringing activities to this District in connection with the Accused Products, as described herein.

7.      This Court has specific and general personal jurisdiction over Google pursuant to due process and/or the California Long Arm Statute

8.      On information and belief, Google is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the California Long Arm Statute, at least

1  because Google has: (i) availed itself of the rights and benefits of the laws of the State of

2  California; (ii) registered to do business in the State of California and has one or more regular

3  and established places of business in the Northern District of California; (iii) transacted,

4  conducted, and/or solicited business and engaged in a persistent course of conduct in the State of

5  California (and in this district); (iv) derived substantial revenue from the sales and/or use of

6  products, such as the infringing Accused Products, in the State of California (and in this

7  District); (v) purposefully directed activities (directly and/or through intermediaries), such as

8  shipping, distributing, offering for sale, selling, and/or advertising its infringing Accused

9  Products, at residents of the State of California (and residents in this District); (vi) delivered its

10 infringing Accused Products into the stream of commerce with the expectation that the Accused

11 Products will be used and/or purchased by consumers; and (vii) committed acts of patent

12 infringement in the State of California (and in this District).

13 **III.     INTRADISTRICT ASSIGNMENT**

14      9.      Pursuant to Local Rule 3-2(c), Intellectual Property Rights actions are assigned on

15 a districtwide basis.

16 **IV.     THE PATENT-IN-SUIT**

17      10.     U.S. Patent No. 6,128,651 (the "'651 Patent") is entitled "Internet Advertising

18 with Controlled and Timed Display of Ad Content from Centralized System Controller" and was

19 duly and legally issued by the United States Patent and Trademark Office ("USPTO") on

20 October 3, 2000.  A Reexamination Certificate for the '651 Patent was duly and legally issued by

21 the USPTO on April 12, 2013.  A copy of the '651 Patent, including the Reexamination

22 Certificate, is attached hereto as Exhibit 1.

23      11.     KlausTech is the owner of all right, title, and interest in and to the '651 Patent,

24 with all rights to enforce the '651 Patent against infringers and to collect damages for all relevant

25 times, including the right to prosecute this action.

26      12.     As it pertains to this lawsuit, the '651 Patent generally concerns methods for

27 displaying, and recording the display of, timed ads in a non-scrolling ad frame on a webpage

28 using a central controller.  '651 Patent at 1:6-7.

1     13.    A core concept of the invention is that, unlike prior Internet advertising systems in

2  which "only the [client] website controls the ad content" (*id.* at 2:16-17), the patented system

3  "uses the [client] website minimally in its scheme of precise timed and display control" (*id.* at

4  3:44-45).  The patented methods instead use a central controller (*e.g.*, computer or computers) to

5  control and track the display of timed, non-scrolling advertisements in the ad frame on a

6  browser.  *See, e.g.*, *id.* Abstract.

7     14.    As described in the '651 Patent, the central controller drives and records the

8  advertising activity through near real-time communication with the browser.  In response to a

9  request for a new ad, the central controller picks the next ad to be displayed and makes sure the

10  browser gets the Internet address from which the selected ad can be fetched.  *Id.* at 2:28-31.  The

11  ad is then fetched and loaded into the non-scrolling ad frame and a timer is initiated.  *Id.* at 3:32-

12  39.  When it is time for a new ad, the central controller receives another ad request and the

13  process repeats itself.  *Id.* at 3:40-43.  The central controller also keeps track of which

14  advertisements are displayed at which browsers and notes by the timer timeout when a given

15  advertisement has been displayed for a minimum time interval.  *Id.* at 2:28-35; 3:32-35, 3:40-43.

16     15.    Because the central controller controls which ads are sent and when, the patented

17  system is able to maintain precise records of the advertising activity.  *Id.* at 3:32-35; *see also id.*

18  at 2:28-33.  In one embodiment, the central controller provides "an audit trail from which

19  websites can be compensated for ad display and advertisers billed for the ad display."  *Id.*at 2:46-

20  48.  In this way, the patented invention provides advertisers with increased knowledge and

21  control over the display of their advertisements and provides "accountability to the website and

22  proof of advertisement display to the paying advertiser."  *Id.* at 3:49-51.

23     16.    Another embodiment of the invention discloses that the central controller

24  "interrogates for a central system controller identifier" for the browser, and, if lacking, "a unique

25  central controller for the browser is generated at the central controller."  *Id.* at 3:1-5.  In this

26  embodiment, the central controller "maintains a large database" that "includes the unique

27  identifier of each inquiring browser and data for ad content . . . displayed to a browser for a

28

---

1    minimum time interval." *Id*. at 3:52-57.  In this way, the patent invention further "enables

2    precision targeted advertising with accountability." *Id.* at 3:48-49.

3         17.    An additional aspect of the '651 Patent lies in its solution to the search engine

4    indexing problem associated with non-scrolling ad frames.  *See, e.g.*, *id.* 2:54-67, 3:26-32.

5         18.    The '651 Patent thus provides novel, technological improvements specific to

6    Internet-related advertising by employing a new, novel, non-conventional approach to

7    controlling and monitoring the display of Internet advertisements on a browser that solves

8    technical problems that do not exist in the conventional advertising realm.

9    **V.     BACKGROUND**

10        19.    Google has offered and/or operated, and continues to offer and/or operate, at least

11   three Internet advertising products or services for or used by publishers:  AdSense, AdMob, and

12   Google Ad Manager (formerly named and/or branded DoubleClick).

13        20.    As Google describes: "Ad Manager is a different product from AdSense and

14   AdMob."  https://support.google.com/admanager/answer/9234653?hl=en.

15        21.    In addition to being distinct products and/or services, upon information and belief,

16   AdMob and Google Ad Manager operate on different technical platforms, include different

17   features and options, are marketed to and targeted toward different publishers or customers,

18   function differently, require different code, and invoke and/or implement different back-end

19   Google computer systems and servers.

20        22.    Google describes AdSense as follows: "AdSense acts as an ad network, providing

21   you access to demand from advertisers and helping you set up your ad inventory. AdSense is

22   best for publishers who want more automation, easy to implement ad solutions, and have a small

23   dedicated ad management team." *See*

24   https://support.google.com/admanager/answer/9234653?hl=en.

25        23.    AdSense ads can be used only on traditional and mobile websites (not in

26   applications or apps on mobile devices (e.g., smartphones and tablets).

27        24.    On information and belief, in 2007 or 2008, Google acquired a company called

28   DoubleClick Inc.

25.     Post-acquisition, Google offered and/or operated its own Internet advertising platform under the brand name DoubleClick.  DoubleClick is Google's ad management product or service for website publishers or publishers with a web presence to display advertisements on the publisher's page(s).

26.     Google's DoubleClick product(s) and/or service(s) was comprised of two major parts: (1) the ad-server called Ad Exchange or AdX; and (2) the Supply Side Platform (SSP) called DoubleClick for Publishers or DFP (including DFP for Small Business and DFP Premium, which were at least two of the different DFP accounts types).

27.     In mid-2018, Google merged the two components of the DoubleClick (AdX and DFP) into a unified product or service, which was renamed and rebranded Google Ad Manager (including Google Ad Manager 360).

28.     Upon information and belief, although the name and brand were changed, infringing tools and functionality within DoubleClick remained within or part of Google Ad Manager.  Thus "Google Ad Manager" refers herein to both Google Ad Manager and DoubleClick AdX/DFP.

29.     Google describes Google Ad Manager as "an ad management platform for large publishers who have significant direct sales. Ad Manager provides granular controls and supports multiple ad networks, including AdSense, Ad Exchange, and third-party networks." *See* https://support.google.com/admanager/answer/9234653?hl=en.

30.     Google Ad Manager can be used on traditional websites, mobile websites, and mobile apps.

31.     In 2010, Google acquired another company, AdMob Inc.  Post-acquisition, in addition to continuing to offer and/or operate DoubleClick (now Google Ad Manager), Google also offered and/or operated another Internet advertising platform under the brand name AdMob.

32.     AdMob is an Internet advertising product or system for publishers of mobile apps to display advertisements on the app(s).

33.     As Google describes, "AdMob is a mobile ad network and monetization platform for mobile developers who want to earn money from ads, gain actionable insights, and grow their

1  app business. As a network, AdMob allows you to monetize your mobile apps by helping you

2  serve ads globally." *See* https://support.google.com/admanager/answer/9234653?hl=en.

3         34.     Unlike Google Ad Manager, AdMob was designed specifically for mobile devises

4  and can be used only on mobile apps.

5  **VI.     GOOGLE'S INFRINGEMENT OF THE '651 PATENT**

6         35.     KlausTech incorporates the above paragraphs as though fully set forth herein.

7         36.     Google offers and/or operates one or more websites,  for example

8  https://admanager.google.com/, https://www.google.com/ads/publisher/, along with associated

9  source code and other computerized instruction, software development kits (SDKs), application

10  programming interfaces (APIs), and/or computers and/or web servers, that support the delivery

11  of advertisements by the Google Ad Manager product(s) and/or service(s) to a browser displayed

12  on a personal computer or a mobile device.

13         37.     Google directs publishers who wish to use the Google Ad Manager product(s)

14  and/or service(s) to enroll or sign up for a Google Ad Manager account (as well as to apply for

15  and be granted a Google AdSense account).  For example, Google has the following

16  requirements and/or provides the following instructions for getting started with the Google Ad

17  Manager:

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Create a Google AdSense account

You need a valid Google AdSense account to sign up for Ad Manager. If you don't have a Google AdSense account already, create a new AdSense account ⧉ .

💡   Your Google AdSense account is only required to set up your Ad Manager account. You aren't required to actively use Google AdSense.

## Sign up for Ad Manager

Your Ad Manager account is permanently linked to your Google AdSense account. If you have more than one Google AdSense account, make sure you sign up for Ad Manager using the right one.

1. Go to admanager.google.com ⧉ to sign up for an account.
2. Click **Create account**, then choose **For myself** or **To manage my business**.
3. Follow the prompts to complete the sign up.

After creating your account, go to admanager.google.com ⧉ to sign in. If you're having trouble signing in, you can also troubleshoot access issues.

**Time zone and currency settings**

⚠   Before you do anything in your new Ad Manager account, make sure that the network settings are correct. Once you have created your first order, network time zone and currency are permanently set and cannot be changed.

1. Sign in ⧉ to Google Ad Manager.
2. Click **Admin** > **Global settings** > **Network settings**.
3. Review time zone and currency settings.
   These setting were configured when the Ad Manager network was created. They can be changed up until you create your first order.
4. If you've made changes, click **Save**.

https://support.google.com/admanager/answer/7084151?hl=en&ref_topic=2566458

38.     Once enrolled in Google Ad Manager, Google requires and/or instructs publishers to create one or more ad units using Google Ad Manager and to create the ad unit(s) pursuant to and in compliance with Google's specifications.

## Add a new ad unit

Learn how to create and define your ad space

Ad units represent the spaces on your website or app where you want to show ads.

An ad unit defines such attributes as the size of the ad format that can show in the ad space. When you create an ad unit, Ad Manager generates a **tag** (a snippet of code) for each ad unit. This tag is then inserted into your webpage or app.

When a user visits the webpage or app, the ad tag makes a request for an ad from Ad Manager. Campaigns that reference or "target" the ad unit are then eligible to serve an ad to that request.

https://support.google.com/admanager/answer/177203

39.     The ad unit is used by Google Ad Manager to, for example, display ad content or creatives.  As Google describes, "ad units represent the spaces on [the publisher's] website or app where [the publisher] wants to show ads." *Id.*

40.     Google Ad Manager includes functionality for ad units that Google refers to as "sticky ads" or "banner ads."  Google describes these sticky ads as an ad that "is a persistently fixed ad unit that stays visible while the user scrolls content on the page up or down." https://support.google.com/admanager/answer/6273531; *see also* https://support.google.com/admanager/answer/7246067 ("The sticky ad must stay in its fixed position on screen without any visible stuttering, choppiness, or delay while the user scrolls through content.")

41.     Google imposes strict requirements and provides detailed instructions for publishers using Google Ad Manager to implement non-scrolling ads or ad units, such as sticky and/or banner ads, and requires that publishers who elect to implement such ads comply with Google's implementation and configuration requirements, instructions, guidelines, and polices. *See* https://support.google.com/admanager/answer/7246067; https://support.google.com/admanager/answer/6273531.

42.     Once an ad unit, including a sticky or banner ad, is created in Google Ad Manager, Google requires or instructs publishers to insert Google code or other computerized

1    instructions, for example Google Publisher Tags (GPT), into the HTML markup of publisher's

2    page, and/or to insert Google code or other computerized instructions into the publisher's mobile

3    app.

4    43.    The Google Publisher Tag library, one or more other Google tag libraries, and/or

5    Google code and/or computerized instruction for Google Ad Manager builds the ad requests and

6    "creates a communication path between the [Google] ad server and a user's browser." *See, e.g.*,

7    https://support.google.com/admanager/answer/181073.

8    44.    Google Publisher Tags can be created in at least the following two ways,

9    automatically by generating the tag through Google Ad Manager and/or using Google's API.

10    *See* https://support.google.com/admanager/answer/1638622.

11    45.    When a page containing a Google Publisher Tag or other code and/or

12    computerized instructions for Ad Manager is rendered or launched, the code inserted into the

13    publisher's page makes a request(s) for an ad from Google Ad Manager and the Google Ad

14    Manager servers respond with an ad to be displayed.  Google describes the sequence of events

15    that occurs when using, for example, Google Publisher Tags in Google Ad Manager as follows:

16

## How GPT works

The Google Publisher Tag is used to define available ad slots in your network. Placing a tag on a page creates a communication path between the ad server and a user's browser. When a page containing a Google Publisher Tag is rendered, the following sequence of events occurs:

  1. A request is made from the user's browser to the ad server for `gpt.js`, the tagging JavaScript.

  2. The tagging JavaScript builds and sends one or more requests (depending on whether SRA is enabled) to the ad server for ads tagged on the page.

  3. The ad server recognizes the ad units and any key-values contained within the request.

  4. The ad server selects the best matching ad.

  5. The ad server returns this ad to the tagging JavaScript.

  6. The JavaScript code associated with the ad tag displays the ad on the page.

25    https://support.google.com/admanager/answer/181073?hl=en&ref_topic=4390039.

26    46.    Google Ad Manager includes timed interval refresh functionality.  Google's

27    website shows that Google Ad Manager instructs publishers how to enable timed interval refresh

28

1    in Google Ad Manager, wherein ads served to a traditional web, mobile web, or mobile app ad

2    unit through Google Ad Manager dynamically reload or refresh at predetermined time intervals

3    without necessarily refreshing the entire contents of the page.  *See*

4    https://support.google.com/admanager/answer/6286179?hl=en.

5           47.    Upon information and belief, in this way, the predetermined time interval or

6    refresh rate is used in Google Ad Manager to set a timer which will be used to determine the

7    interval to display a particular ad before Google Ad Manager requests for and/or responds with

8    another ad for display.

9           48.    Google requires and/or instructs publishers who elect to use the refresh

10   functionality in Google Ad Manager, including timed interval refresh, to use Google Ad

11   Manager settings or implement refresh using the Google Publisher Tag library.  *See id.*; *see also*

12   https://developers.google.com/doubleclick-gpt/samples/refresh and

13   https://developers.google.com/doubleclick-gpt/guides/control-ad-loading.

14          49.    Google further instructs publishers who elect to implement a refresh rate,

15   including timed interval refresh, to generate a particular Google Publisher Tag and apply

16   particular modifications.  For example, publishers are instructed not to configure timed interval

17   refresh in a particular manner, including as the exemplary Google Ad Manager documentation

18   below reflects:

19

20

21

22

23

24

25

26

27

28

**Best practices**

When working with `refresh()`, there are some best practices that should be adhered to.

1. Don't refresh too quickly.

   Refreshing ad slots too quickly may cause your ad requests to be throttled. To prevent this, avoid refreshing slots more frequently than once every 30 seconds.

2. Don't call `clear()` unnecessarily

   When refreshing an ad slot, do not call `PubAdsService.clear()` first. This is unnecessary, since `refresh()` replaces the contents of the specified slot, regardless of whether any ad content was previously loaded. Calling `clear()` immediately before calling `refresh()` will only increase the amount of time a blank slot is visible to the user.

3. Only refresh viewable ad slots

   Using `refresh()` to replace the contents of ad slots that are never viewable can significatly lower your ActiveView rate. The ImpressionViewableEvent can be used to determine when an ad slot has become viewable, as in the example below.

```
googletag.cmd.push(function() {
  var REFRESH_KEY = 'refresh';
  var REFRESH_VALUE = 'true';

  googletag.defineSlot('/6355419/Travel',[728, 90], 'div-for-slot')
      .setTargeting(REFRESH_KEY, REFRESH_VALUE)
      .setTargeting('test', 'event')
      .addService(googletag.pubads());

  // Number of seconds to wait after the slot becomes viewable.
  var SECONDS_TO_WAIT_AFTER_VIEWABILITY = 60;

  googletag.pubads().addEventListener('impressionViewable', function(event) {
    var slot = event.slot;
    if (slot.getTargeting(REFRESH_KEY).indexOf(REFRESH_VALUE) > -1) {
      setTimeout(function() {
        googletag.pubads().refresh([slot]);
      }, SECONDS_TO_WAIT_AFTER_VIEWABILITY * 1000);
    }
  });

  googletag.enableServices();
});
```

*See* https://developers.google.com/doubleclick-gpt/guides/control-ad-loading.

50.     Information about the user and/or the device is passed within the ad request to Google Ad Manager, including at least the following information: (1) the HTTP header; (2) the IP address; (3) a user identifier (including advertising ID, AdID, IDFA, cookie based unique identifier, or other identifiers, PPID, and/or DoubleClick cookies); (4) the custom targeting criteria set by the publisher in the Ad Manager ad tags; and (5) a "correlator" value shared between ad requests on the same page.  *See* https://support.google.com/admanager/answer/1143651.

51.     Google publicly provides the below table that "details how this data is used in the ad selection process:"

---

| Data | Provides information on |
|------|--------------------------|
| HTTP header | Browser type |
| | Operating system |
| | Date and time |
| IP address | Geographic location |
| | Internet-related targeting information like user domain |
| User identifier | Frequency capping |
| | Creative rotation |
| | Audience list membership |
| Ad Manager ad tags | Ad unit and size |
| | Which creative types the ad unit can receive |
| | Custom targeting parameters (key-values) |
| Correlator value | Which ad requests belong to the same page view (used for advanced serving functionality like roadblocking) |

*Id.*

52.     Upon information and belief, Google records or logs the data parameters within a Google Ad Manager ad request to the Google Ad Manager servers.

53.     Once Google Ad Manager has selected the creative(s) to serve for the ad slot(s) that are part of the HTTP ad request, Google Ad Manager "records information about the winning ads for delivery reporting purposes."  *See* https://support.google.com/admanager/answer/1143651.

54.     On information and belief, Google Ad Manager records data parameters within an ad response.

55.     Google Ad Manager "constructs an HTTP response containing the creative code, and replies to the original HTTP request."   The Google Ad Manager code and/or computerized instructions on the publisher's page receives the response from Google Ad Manager servers, processes it, and displays the advertisement specified within.

COMPLAINT FOR PATENT INFRINGEMENT        -13-        Case No. 3:20-cv-04459

1    56.    Upon information and belief, where a publisher has implemented or enabled

2    sticky or banner ad units with timed interval refresh in the manner Google requires and instructs,

3    Google Ad Manager starts a refresh timer corresponding to the predetermined time interval or

4    refresh rate.  Once the ad is displayed for a predetermined period of time, Google Ad Manager

5    will implement the embedded refresh functionality to request and then respond with a new ad.

6    57.    Operating in this manner, for example, Google's formerly-branded DoubleClick

7    product(s) and/or service(s), and its rebranded and renamed Google Ad Manager product(s)

8    and/or service(s) (collectively, the "Accused Product") embody the patented invention of

9    the '651 Patent, including at least claims 20 and 25, because they operate by, *inter alia*,

10   providing a non-scrolling ad display in a page (traditional web, mobile web, and/or mobile app)

11   that causes browsers hitting the website to undertake centrally controlled and recorded ad display

12   for guaranteed minimum timed intervals in the manner claimed in the '651 Patent.

13   **VII.    KNOWLEDGE OF THE '651 PATENT**

14   58.    KlausTech incorporates the above paragraphs as if fully stated herein.

15   59.    KlausTech and Google were involved in previous litigation over the '651 Patent

16   (regarding the separate and different AdMob product).  During that litigation, Google filed a

17   request for *ex parte* reexamination of the '651 Patent.  Reexamination resulted in the issuance of

18   a reexamination certificate with the asserted claims on April 12, 2013.

19   60.    Google thus had actual and constructive knowledge and awareness of the '651

20   Patent at least as early as April 2013, when the USPTO issued the Reexamination Certificate,

21   and Google continued to infringe the '651 Patent despite this knowledge.  Google acted despite

22   an objectively high likelihood that its actions constituted infringement of a valid patent.

23   **VIII.   COUNTS OF PATENT INFRINGEMENT**

24   61.    KlausTech incorporates the paragraphs above as if fully stated herein.

25   62.    Google has infringed, literally or under the doctrine of equivalents, the '651

26   Patent in this Judicial District and elsewhere in the United States by, among other things,

27   making, using, importing, selling, and/or offering for sale its Accused Product.

28

1    63.    In addition to directly infringing the '651 Patent pursuant to 35 U.S.C. § 271(a),

2    Google also indirectly infringes the '651 Patent, including by instructing, directing, and/or

3    requiring others, including its publishers, customers, purchasers, users, and/or developers, to

4    perform all or some of the steps of the method claims of the '651 Patent, either literally or under

5    the doctrine of equivalents, or both.

6    64.    Google's infringement is based upon literal infringement or infringement under

7    the doctrine of equivalents, or both.

## COUNT I
### (Direct Infringement Pursuant to 35 U.S.C. § 271(a))

8

9    65.    KlausTech incorporates the paragraphs above as if fully stated herein.

10   66.    Google has directly infringed the '651 Patent, including at least claims 20 and 25,

11   in violation of 35 U.S.C. § 271(a).

12   67.    Google's infringement includes, but is not limited to, the manufacture, use, sale,

13   importation and/or offer for sale of the Accused Products.  The Accused Products embody the

14   patented invention of the '651 Patent.  Google practices each element of at least claims 20 and 25

15   of the '651 Patent because it performs each step of the claimed method or performance of any

16   step by a third party(s) is attributable to Google.

17   68.    Google's infringement is based upon literal infringement or infringement under

18   the doctrine of equivalents, or both.

19   69.    Google's infringement of the '651 Patent has injured KlausTech in an amount to

20   be proven at trial, but not less than a reasonable royalty.

21   70.    KlausTech is entitled to damages and any other relief in accordance with

22   35 U.S.C. §§ 283, 284, and 285.

## COUNT II
### (Indirect Infringement Pursuant to 35 U.S.C. § 271(b))

23

24   71.    KlausTech incorporates the above paragraphs as if fully stated herein.

25   72.    Google has induced infringement of the '651 Patent, including at least claims 20

26   and 25, in violation of 35 U.S.C. § 271(b).

27   73.    Google's indirect infringement includes, but is not limited to, with the specific

28   intent to encourage infringement, knowingly inducing others, including publishers, customers,

1    purchasers, users, and/or developers to use the Accused Products and infringing methods that

2    Google knows or should know infringe one or more claims of the '651 Patent.  Google, *inter*

3    *alia*, instructs, directs, and/or requires others, including publishers, customers, purchasers, users,

4    and/or developers, to perform one or more of the steps of the method claimed in the '651 Patent

5    either literally or under the doctrine of equivalents, where all of the steps of the method claims

6    are performed by, or performance of one or more steps is attributable to, Google or its

7    publishers, customers, purchasers, users, or developers. Google knew or was willfully blind to

8    the fact that they were inducing others, including publishers, customers, purchasers, users, and

9    developers, to infringe by practicing, either themselves or in conjunction with Google, one or

10   more of method claims of the '651 Patent, including at least claims 20 and 25.

11          74.     Google knowingly and actively aided and abetted the direct infringement of

12   the '651 Patent by instructing and encouraging its publishers, customers, purchasers, users, and

13   developers to use the '651 Accused Products. Such instructions and encouragement included, but

14   is not limited to, requiring and/or advising third parties to use the Accused Products in an

15   infringing manner, providing a mechanism through which third parties may infringe the '651

16   Patent, advertising and promoting the use of the Accused Products in an infringing manner, and

17   distributing guidelines and instructions to third parties on how to use the Accused Products in an

18   infringing manner.

19          75.     Google's inducement to infringe is based upon literal infringement or

20   infringement under the doctrine of equivalents, or both.

21          76.     Google's infringement of the '651 Patent has injured KlausTech in an amount to

22   be proven at trial, but not less than a reasonable royalty.

23          77.     KlausTech is entitled to damages and any other relief in accordance with 35

24   U.S.C. §§ 283, 284, and 285.

## COUNT III
### (Indirect Infringement Pursuant to 35 U.S.C. § 271(c))

26          78.     KlausTech incorporates the above paragraphs as if fully stated herein.

27          79.     Google has contributorily infringed one or more claims of the '651 Patent,

28   including at least claims 20 and 25, in violation of 35 U.S.C. § 271(c) and/or (f).

1    80.    Google has indirectly infringed the '651 Patent pursuant to 35 U.S.C. § 271(c)

2 and/or (f) by, with knowledge of the '651 Patent and its infringing use, offering, providing,

3 and/or selling to its publishers, customers, purchasers, users, and/or developers and/or importing

4 into the United States, its applications and/or other products.  That application(s) and/or other

5 product(s) (i) being a material part of the patented inventions claimed in the '651 Patent, (ii) is

6 not a staple article or commodity of commerce suitable for substantial noninfringing use, and

7 (iii) was especially made or especially adapted for use in an infringement of the '651 Patent,

8 which Google knew.

9    81.    Google's contributory infringement is based upon literal infringement or

10 infringement under the doctrine of equivalents, or both.

11    82.    Google's infringement of the '651 Patent has injured KlausTech in an amount to

12 be proven at trial, but not less than a reasonable royalty.

13    83.    KlausTech is entitled to damages and any other relief in accordance with 35

14 U.S.C. §§ 283, 284, and 285.

15 **IX.    PRAYER FOR RELIEF**

16    **WHEREFORE**, KlausTech respectfully requests that the Court find in its favor and

17 against Google, and that the Court grant KlausTech the following relief:

18    A. An entry of judgment holding that Google has directly and/or indirectly infringed one

19 or more claims of the '651 Patent, either literally and/or under the doctrine of equivalents;

20    B. An award to KlausTech of such damages as it shall prove at trial against Google that is

21 adequate to fully compensate KlausTech for Google's infringement of the '651 Patent, said

22 damages to be no less than a reasonable royalty;

23    C. An award to KlausTech of increased damages under 35 U.S.C. § 284;

24    D. A finding that this case is "exceptional" under 35 U.S.C. § 285 and an award to

25 KlausTech of its reasonable attorneys' fees, expenses, and costs incurred in this action;

26    E. An award to KlausTech of pre-judgment and post-judgment interest on the damages

27 caused by Google's infringing activities and other conduct complained of herein; and

28    F. Such further and other relief as the Court may deem proper and just.

## X.    JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, KlausTech hereby requests a trial by jury on all issues and claims so triable.

Dated:  July 6, 2020                                                    Respectfully submitted,

By:     */s/ Robert F. Kramer*
        Robert F. Kramer (SBN 181706)
        rkramer@feinday.com
        Sal Lim (SBN 211836)
        slim@feinday.com
        Jeremiah A. Armstrong (SBN 253705)
        jarmstrong@feinday.com
        FEINBERG DAY KRAMER ALBERTI
        LIM TONKOVICH & BELLOLI LLP
        577 Airport Boulevard, Suite 250
        Burlingame, California 94010
        Telephone: (650) 825-4300
        Facsimile:  (650) 460-8443

        Andrew G. DiNovo
        (*pro hac vice* application forthcoming)
        adinovo@dinovoprice.com
        Nicole E. Glauser
        (*pro hac vice* application forthcoming)
        nglauser@dinovoprice.com
        DINOVO PRICE LLP
        7000 N. MoPac Expressway, Suite 350
        Austin, Texas 78731
        Telephone: (512) 539-2626
        Facsimile:  (512) 539-2627

        ATTORNEYS FOR PLAINTIFF
        KLAUSTECH LLC